NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0389n.06

No. 15-5921

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jul 12, 2016
DEBORAH S. HUNT, Clerk

LEO PARRINO,

    Petitioner-Appellant,

v.

UNITED STATES OF AMERICA,

    Respondent-Appellee.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES. DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY

Before: COOK and KETHLEDGE, Circuit Judges; SARGUS, District Judge.[*]

KETHLEDGE, Circuit Judge. Pharmacist Leo Parrino pled guilty to a federal misdemeanor for introducing and delivering misbranded inhalation drugs into interstate commerce. As a result of his conviction, he cannot participate in any federal healthcare program for five years. Parrino petitioned the district court to set aside his conviction, arguing that he would not have pled guilty had he known that his conviction would effectively prevent him from working as a pharmacist. The district court denied Parrino's petition and we affirm.

I.

Parrino began working as a pharmacist in 1974. In 2002, he went to work for National Respiratory Services, where he was responsible for preparing and mixing pharmaceutical ingredients to create respiratory medications. In 2008, an FDA investigator audited National Respiratory and found that it was distributing extremely subpotent doses of budesonide, a steroid

---

[*] The Honorable Edmund A. Sargus, Jr., Chief Judge of the United States District Court for the Southern District of Ohio, sitting by designation.

suspension used in inhalers to treat asthma and chronic obstructive pulmonary disease. The FDA investigator found company records showing that in 2005, National Respiratory had tested samples of its budesonide and found that much of it was subpotent and that some of it was superpotent. National Respiratory had shipped this defective (and thus misbranded) budesonide to patients in over a dozen states. Many of the misbranded budesonide doses were billed to Medicare.

In 2009, federal investigators contacted Parrino, who in 2006 had moved on to work as a pharmacist for K-Mart. According to the investigators, they specifically asked Parrino whether National Respiratory had shipped any subpotent or superpotent batches. Parrino said that any such batches had been destroyed before they were shipped to patients. The investigators returned later in the year. They asked him again whether National Respiratory had shipped any defective batches of budesonide, and again Parrino denied that he had. They then showed Parrino the company's own lab reports indicating that its budesonide was defective. Parrino then changed his story: he admitted that he knew National Respiratory had shipped some defective budesonide and that he had told National Respiratory's COO about the problem. At the end of the interview, he prepared and signed a handwritten statement acknowledging that, while he worked as National Respiratory's pharmacist, he was aware that he had prepared defective (misbranded) budesonide that the company later shipped to patients.

In making that concession, Parrino had admitted to participation in a federal crime under 21 U.S.C. § 331(a), which prohibits the delivery of misbranded drugs into interstate commerce. Violations are punishable by up to a year in prison, or three years if the act is committed with the "intent to defraud and mislead[.]" 21 U.S.C. § 333(a)(1)-(2). In May 2010, lawyers from the U.S. Attorney's office in Louisville met with Parrino and his lawyer, Kenneth Plotnik. They told

Parrino that they hoped to secure his cooperation in a criminal case against National Respiratory's COO. If Parrino cooperated, the government would charge him with a misdemeanor violation of the law against misbranding; if Parrino refused, he would face a felony prosecution and could be held liable for over $2 million in restitution.

The next day, according to Plotnik, he and Parrino met to discuss Parrino's options. Again according to Plotnik, Parrino was "extremely distraught . . . and he was unwilling to really even discuss [possible] defenses very much. He was going to plead guilty to the misdemeanor, and if there were consequences, we would deal with them later." Parrino, according to Plotnik, was well aware that there would be collateral consequences if he pled guilty to the misdemeanor charge, including the possible revocation of his pharmacist's license by the Kentucky Board of Pharmacy.

> He knew that coming in. He also knew that there was some—there was another thing called this statute that would expel him from prescribing. He knew there was a statute out there. He knew there was some federal—he had either done some research between the year after he had been contacted by the agents and he contacted me, or maybe he [knew] it from his continuing pharmaceutical education, but he knew that there was this exclusion statute associated with a fraud conviction and most—but we definitely knew about this.

Plotnik thereafter researched the federal statute in question, 42 U.S.C. § 1320a-7, which instructs the Secretary of Health and Human Services to exclude (for five years) certain individuals and entities from participation in any federal health-care program on a mandatory or permissive basis, depending on certain conditions, such as whether the excluded person has been convicted of certain crimes or has had his license suspended by a state licensing authority. *See* 42 U.S.C. § 1320a-7. Plotnik became convinced that Parrino would fit within the terms of the "permissive" portion of the statute, so that it would be up to the Secretary's discretion whether

Parrino was barred from participating in federal health-care programs. About one month after Parrino and Plotnik met with the U.S. Attorney's office, Plotnik advised Parrino that Parrino "was going to be in this permissive section and not in this mandatory exclusion section . . . of course, I couldn't guarantee that they wouldn't exclude him because even under the permissive section, exclusion was still a possibility."

Thus, according to Plotnik, Parrino and Plotnik had discussed the possibility that "[Parrino] could lose his license. He could lose the ability to prescribe medication. But [Parrino] was adamant that he would not . . . face trial [for] the felony. He would not do it." Plotnik was interested in exploring defenses for Parrino: "I wanted to take it to trial. I thought there were problems—constitutional problems with [the case]." But "Parrino was very unwilling to discuss defenses." Plotnik thereafter went about negotiating a plea that would downplay Parrino's role in the criminal conduct at National Respiratory, as part of a "strategy . . . both for the purpose of the Board of Pharmacy and for the exclusion statute, to minimize [Parrino's] activities or behaviors." Parrino eventually pled guilty to the misdemeanor misbranding charge in September 2011. The date of his sentencing was dragged out by continuances, and Plotnik wrote in emails to Parrino that this was a good thing: "this is going to postpone the day when you are going to face any discipline from the Board of Pharmacy."

In 2013, the district court sentenced Parrino to one year of probation and ordered him to pay $14,000 in restitution. The Office of the Inspector General at the Department of Health and Human Services later determined that Parrino's five-year exclusion from federal programs was mandatory. The Kentucky Board of Pharmacy also began investigating the possible revocation of Parrino's license. Parrino thereafter lost his job as a pharmacist at K-Mart.

Parrino thereafter petitioned the district court to vacate his conviction because, he argued, he would have risked trial rather than plead guilty had he known that he would face mandatory exclusion from federal programs due to his misdemeanor conviction. He argued that Plotnik's failure to advise him that a misdemeanor conviction would likely subject him to mandatory exclusion was constitutionally ineffective assistance of counsel, and that his guilty plea was therefore defective. The district court held a hearing to consider Parrino's claim. There, Parrino testified that he "had no discussions with Mr. Plotnik regarding [the] potential collateral consequences" of a guilty plea.

The district court denied Parrino's petition after concluding that Plotnik's alleged failure to advise Parrino of the potential collateral consequences of his guilty plea did not violate Parrino's Sixth Amendment right to effective assistance of counsel. The court also concluded that, even if Parrino did have a right to be advised of the collateral consequences of his plea, Plotnik in fact fulfilled his obligation. The court found Plotnik's testimony more credible than Parrino's, and held as a factual matter that "Plotnik made Parrino aware of the provisions of the [exclusion] statute and its possible application to [Parrino] based upon the entry of his misdemeanor guilty plea." Finally, the court concluded that, even if Plotnik had failed to properly advise Parrino of the collateral consequences, that omission did not prejudice Parrino, because it would have been objectively unreasonable for Parrino to pass up the plea deal he received and instead face a felony trial and a potential restitution award of $2.4 million. This appeal followed.

## II.

We review the district court's legal conclusions de novo and its factual findings for clear error. *See United States v. Jackson*, 181 F.3d 740, 743-44 (6th Cir. 1999). We afford "great

deference" to the district court's credibility determinations. *United States v. Grubbs*, 773 F.3d 726, 731 (6th Cir. 2014).

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . the Assistance of Counsel *for his defence*." U.S. Const. amend. VI (emphasis added). The right to counsel is not a right to competent legal advice regarding all aspects of the accused's life. Rather, it is a right to "Assistance" in a particular type of legal proceeding—the "criminal prosecution[.]" *Id.* That right stems from the recognition that, in an adversarial trial, "access to counsel's skill and knowledge is necessary to accord . . . ample opportunity to meet the case of the prosecution[.]" *Strickland v. Washington*, 466 U.S. 668, 685 (1984).

A guilty plea, however, is a "break in the chain" of criminal proceedings. *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). The integrity of the criminal-justice system requires the presumption that the plea is final. So "[w]hen a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged . . . [h]e may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards" of effective representation required by the Sixth Amendment. *Id.*

Thus, an argument that counsel rendered constitutionally-ineffective assistance in advance of trial is an argument that counsel was so ineffective that the defendant either pled guilty involuntarily, pled guilty without awareness of the elements of the crime he committed, or pled guilty without awareness of potentially successful defenses to criminal liability. *Cf. United States v. Ruiz,* 536 U.S. 622, 630 (2002) (noting that a knowing guilty plea "does not require complete knowledge of the relevant circumstances"). Typically, a defendant's failure to consider

the numerous potential collateral consequences of a criminal conviction—*e.g.*, prohibitions on certain categories of employment, or future limitations on constitutional rights—does not vitiate a guilty plea. *See, e.g.*, *United States v. Youngs*, 687 F.3d 56, 61-63 (2d Cir. 2012); *United States v. Delgado-Ramos*, 635 F.3d 1237, 1239-40 (9th Cir. 2011) (per curiam). In 2010, however, the Supreme Court held that counsel's failure to advise a criminal defendant that a guilty plea would lead to his deportation voided the defendant's guilty plea so long as the defendant would reasonably have proceeded to trial but for counsel's failure. *See Padilla v. Kentucky*, 559 U.S. 356, 374 (2010). Parrino argues that the rule expressed in *Padilla* should apply to his case, and that Plotnik therefore had a duty to advise Parrino of the potential collateral consequences of Parrino's plea, including the risk that Parrino would be barred from participating in federal health-care programs. Parrino asserts that Plotnik neglected that duty and that Parrino's guilty plea was thus entered involuntarily.

Apart from the common ground of attorney advice, however, Parrino's case has little in common with Padilla's. The holding in *Padilla* was limited to advice "concerning the specific risk of deportation" and was based upon a long tradition that placed deportation in "close connection to the criminal process," which made deportation "uniquely difficult to classify as either a direct or a collateral consequence." *Id.* at 366. The *Padilla* Court also noted the particularly "harsh consequences of deportation." *Id.* at 360. The penalty of complete banishment from the United States is different in kind from the burden of five years' exclusion from federal health-care programs.

Yet even assuming for the sake of argument that Plotnik had a duty to advise Parrino of the collateral regulatory consequences of Parrino's guilty plea, Plotnik fulfilled that duty here by thoroughly discussing with Parrino the potential collateral consequences of a guilty plea. Parrino

says those discussions were not sufficient because Plotnik did not tell Parrino that he was guaranteed to be subject to "mandatory exclusion." Parrino Br. at 23 (quoting Plotnik's testimony). But Parrino demands much more of Plotnik than the Court asked of defense counsel in *Padilla*. There, the Court required that counsel have a "rudimentary understanding of the deportation consequences of a particular criminal offense" so that he would "be able to plea bargain creatively with the prosecutor in order to craft a conviction and sentence that reduce the likelihood of deportation[.]" *Padilla*, 559 U.S. at 373. The *Padilla* Court required further that counsel advise his client whether his plea carries the "risk" of deportation. *Id.* at 374. Here, Plotnik thought Parrino fit within the "permissive" exclusion provision, and crafted a plea agreement written to minimize Parrino's culpability and persuade the Office of the Inspector General at the Department of Health and Human Services—which administers the exclusion statute—that Parrino deserved to continue practicing as a pharmacist. Plotnik's strategy was a reasonable one: defendants who are convicted of misdemeanor misbranding, as Parrino was, are sometimes subject to the permissive exclusion provision contained in 42 U.S.C. § 1320a-7(b). *See Friedman v. Sebelius*, 686 F.3d 813, 817 (D.C. Cir. 2012). But Plotnik warned Parrino that there was still a real risk of exclusion: "I couldn't guarantee that they wouldn't exclude him." Plotnik's advice met the standard for effective assistance of counsel articulated in *Padilla*.

The district court's judgment is affirmed.